In re Susan Claire DEREVE, Debtor.

Christine Morrissy, Plaintiff,

v.

Susan Claire Dereve, Defendant.

Bankruptcy No. 06–30455.
Adversary No. 06–03030.

United States Bankruptcy Court,
N.D. Florida.

June 4, 2007.

---

Charles P. Hoskin, Emmanuel, Sheppard and Condon, Pensacola, FL, for Plaintiff.

Amy Logan Sliva, Law Office of Amy Logan Sliva, Pensacola, FL, for Debtor.

## ORDER GRANTING THE PLAINTIFF'S 11 U.S.C. § 727 OBJECTION TO DISCHARGE OF THE DEBTOR'S DEBTS

MARGARET A. MAHONEY,
Bankruptcy Judge.

This matter came before the Court on the plaintiff's adversary complaint objecting to the debtor's discharge. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order. For the reasons indicated below, the Court is denying the plaintiff's objection to the debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5), but granting the plaintiff's objection to the debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A).

## FACTS

### A. *Background*

Susan Claire Dereve, the debtor, and Christine Morrissy, the plaintiff, were joint shareholders of Gulf Coast Best Partners LLC ("Gulf Coast"), an accounting software consulting firm they formed on January 28, 2004. In April 2004, Ms. Morrissy expressed a desire to dissolve Gulf Coast. Disputes had arisen between the two, which resulted in a lawsuit.

Ms. Dereve filed a claim against Ms. Morrissy in small claims court. Ms. Morrissy counterclaimed against Ms. Dereve for damages and $1,732 Ms. Morrissy claimed Ms. Dereve charged to Gulf Coast's credit cards. Since an accounting was required to wind up Gulf Coast's affairs, the case had to be moved to the circuit court of Santa Rosa County, Florida ("Circuit Court"). The Circuit Court appointed a Special Master to conduct an accounting of Gulf Coast's books.

The final written report from the Special Master [Exhibit # 21], dated December 12, 2005, found that "Sue Dereve is due $2,350.00 from Gulf Coast Best Partners, LLC" and "Christine Morrissy owes $2,350.00 to Gulf Coast Best Partners, LLC". In his report, the Special Master noted: "I HAVE NOT CONSIDERED AMOUNTS DUE TO THE OTHER PARTY [i.e. Ms. Morrissy] OUTSIDE OF THE OPERATIONS OF GULF COAST BEST PARTNERS, LLC. DUE TO THE FACT THAT SUCH TRANSACTIONS ARE OUTSIDE OF THE SCOPE OF THE DUTIES SPECIFIED BY THE COURT WITH REGARD TO THIS CASE."

The final written opinion of the Circuit Court judge [Exhibit # 18], dated February 17, 2006, adjusted downward to $497.68 the Special Master's finding of $2,350 owed to Ms. Dereve and awarded a judgment of $4,010.30 to Ms. Morrissy on her counterclaim. On March 31, 2006, the Circuit Court judge issued a "SUPPLEMENTAL FINAL JUDGMENT AGAINST SUSAN C. DEREVE TAXING COSTS AND ATTORNEYS' FEES" ("Supplemental Final Judgment") [Exhibit # 19], in which he noted that since Ms. Dereve declined an offer of judgment from Ms. Morrissy on January 4, 2005, she owed fees and costs incurred after such date in the following amount: (1) $30,500 to Ms. Morrissy for attorneys' fees and legal assisting fees, (2) $3,965 to Ms. Morrissy for costs, and (3) $5,344.50 to Ms. Morrissy's lawyers for Ms. Dereve's share of the Special Master's fees.

Ms. Dereve filed a voluntary chapter 7 case on July 31, 2006. The debtor's schedules indicate that the majority of her debts are consumer debts. The debtor claims $208,952 in assets, $195,000 of which is the value of her homestead. Listed three times on Schedule F ("Creditors Holding Unsecured Nonpriority Claims") of the debtor's bankruptcy petition is Christine Morrissy: (1) $4,010 for the "2006 Judgment", (2) $43,376 for the "Supplemental Final Judgment", and (3) "Unknown" for "Any and all pending and future lawsuits and claims".

The Court held a trial on May 7, 2007. At trial, the debtor testified that although she received her credit counseling in March and spoke with her attorney, Amy Sliva, in May, she did not contemplate filing for bankruptcy until June. On Part 9 ("Payments related to debt counseling or bankruptcy") of her statement of financial affairs ("SOFA"), which requires the listing of "all payments made ... to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within one year immediately preceding the com-

mencement of this case[,]" the debtor only listed a $1,000 attorney fee to Ms. Sliva.

### B. *Residence and Furnishings*

On her bankruptcy petition, the debtor listed 1004 Tanton Circle in Pensacola, Florida, as her address ("Tanton home"). Towards the end of 2005, the debtor spoke with Cathi Oursler, who is a real estate agent, regarding the listing for sale of the Tanton home. Ms. Oursler testified that the debtor stated that she wanted to sell the Tanton home because she wanted to spend time with her parents in England due to the fact that her father was ill. The debtor also stated that her intention was to travel back and forth between England and the United States.

In January 2006, the debtor hired Ms. Oursler to list the Tanton home for sale. Ms. Oursler and the debtor signed a listing agreement to sell the house on January 24, 2006. This listing agreement became effective on January 25, 2006.

On February 1, 2006, the debtor and her husband at the time filed and recorded a "Designation and Declaration of Homestead" [Exhibit # 36]. The debtor testified that she paid a consultant with a company called Homestead Protection Services to assist her in preparing this document. On February 23, 2006, the debtor entered into a mortgage modification agreement with Bank of America [Exhibit # 23], increasing one of her mortgages from $30,000 to $79,000. The debtor testified at trial that she decided to increase her mortgage despite already having a home equity line of credit. The debtor testified that she had no equity left in the Tanton home as of the time of trial.

On April 24, 2006, Ms. Morrissy filed a notice of lis pendens on the Tanton home [Exhibit 20]. This notice was recorded on May 4, 2006. The Tanton home listing was withdrawn on April 25, 2006. Ms.

Oursler testified that a legitimate buyer was interested in purchasing the Tanton home but lost interest when he or she discovered that a judgment lien was placed on the property.

On Schedule A ("Real Property"), the debtor listed the Tanton home as her homestead. At trial, the debtor testified that she is currently residing with friends in Pensacola, Florida, because the Tanton home is in foreclosure proceedings. On Schedule J ("Current Expenditures of Individual Debtor(s)"), the debtor listed $1,531 as "[r]ent or home mortgage payment". Underneath this listing, the debtor checked "Yes" with regard to both of the following questions: (1) "[a]re real estate taxes included ...", and (2) "[i]s property insurance included...." The debtor testified that the $1,531 she listed represented the rent she was paying for an apartment in Essex, England ("English apartment"). The debtor further represented that the amount she was paying for the English apartment was equivalent to her monthly mortgage payment on the Tanton home. The debtor testified that she originally went back to England because her parents were getting older, her father was ill, and she wanted to spend some time with them. The debtor testified that she left for England around the first week of July 2006 and arrived back in the U.S. on September 10, 2006, for purposes of her Rule 2004 examination. Prior to leaving for England and upon her return, the debtor testified that she lived at the Tanton home until the foreclosure proceedings.

Exhibits submitted to the Court include numerous photos taken of the exterior and interior of the Tanton home. Ms. Oursler testified that she took most of the pictures provided as evidence to the Court [Exhibits # 16 and # 17]. She further testified as to the contents of the debtor's house,

while using the pictures as aids. The exhibits include pictures of every room of the debtor's house while it was still furnished. When asked as to the contents of the living room at the time she took the pictures, Ms. Oursler testified that the debtor's living room had a rug, sofa, loveseat, candles, a television, a stereo, speakers, and pictures on the wall. The Court's own observation of the contents of the living room in the photos submitted also evidence that the living room additionally contained a table (presumably an end table, although the picture was not clear in this regard) and a television stand. When asked as to the contents of the dining room at the time she took the pictures, Ms. Oursler testified that the debtor used her dining room as an office. Ms. Oursler testified that at the time she took the pictures of the debtor's dining room, the room contained an office desk, a television, a stereo, a rug, a couple of computers, a file cabinet, and a server. The Court's own observation of the contents of the dining room in the photos submitted also evidence that the dining room additionally contained a computer desk and a lamp. When asked as to the contents of the master bedroom at the time she took the pictures, Ms. Oursler testified that the master bedroom contained a bed, a dresser, a chair, pictures on the wall, a lamp, and a ceiling fan. When asked as to the contents of the second bedroom in the debtor's home at the time she took the pictures, Ms. Oursler testified that the second bedroom contained a couch or futon, a table, a television, a leather chair, blinds, and pictures on the wall. Ms. Oursler testified that at the time she took the pictures, the debtor's house also contained a hot tub, a kitchen table with chairs, pool furniture, a washer and dryer in the laundry room, a full kitchen (e.g. pots, pans, dishes), linens, and a closet full of clothes. In summation, Ms. Oursler testified that at the time she took the

pictures, the debtor's house was fully furnished with the exception of one room that was only partially furnished. Ms. Oursler testified that the debtor moved most of her furniture to England. However, the debtor left some furniture in the Tanton home to enable her to work while she was in the United States.

On Schedule B ("Personal Property"), the debtor only listed ownership of the following pieces of furniture, household goods, and clothes: a bed, dresser, two night stands, small refrigerator, washer, dryer, freezer, small appliances, dishes, silverware, television, stereo, couch, two end tables, coffee tables, a dinette and $70 of clothes. The debtor listed the value of her furniture and household goods as $1,205. The debtor testified at trial that she also has a Sony Vaio computer, a docking station, a laser printer, and a wireless keyboard, all of which are located in the English apartment. The debtor testified that she did not list these items in her schedules because they are business assets.

In Part 10 ("Other Transfers") of her SOFA, the debtor listed that she sold a washer, dryer and hot tub to Tracy Evers for $800; a television and home theater system to John Mowry for $500; a generator, microwave and patio set to Danette Orth for $500; and a generator and tools to "Unknown" for $500. Ms. Morrissy testified that calculations based on her review of the debtor's general ledgers [Exhibits # 3 and # 4] show that Ms. Dereve spent (1) $20,091.44 on office equipment, household goods, and electrical goods during the six months prior to the petition date, and (2) $2,452.42 on clothing and shoes during the six months prior to the petition date. These numbers are generally correct, according to the Court's review. Ms. Dereve testified that the $1,205 value she placed on her furniture and the $70 value she placed on her clothing included

all items she purchased prior to filing for bankruptcy.

The debtor's general ledgers show that Ms. Dereve paid (1) $633.75 on January 25, 2006, to an international moving company named Global to ship furniture from the Tanton home to England, (2) $3,591.25 on February 28, 2006, to Global to ship furniture from the Tanton home to England, (3) $1,148.67 on March 22, 2006, to an international shipping company named Simpsons to ship furniture from the Tanton home to England, and (4) 420 pounds on July 12, 2006, to a moving company in England to move furniture within England. Overall, the debtor paid more than $5,000 in moving expenses for her furniture.

## C. *Alleged Transfers*

The debtor transferred numerous assets that she failed to report on her schedules. For purposes of this opinion, the Court will only focus on wire transfers the debtor made between the United States and England:

(1) On February 7, 2006, Ms. Dereve transferred $23,000 from her U.S. Bank of America account to her father's bank account in England; [1]

(2) On March 22, 2006, Ms. Dereve transferred $60,000 from her U.S. Bank of America account to her father's bank account in England;

(3) On April 13, 2006, Ms. Dereve transferred $27,970 from her father's bank account in England to a U.S. bank account in the name of Dereve Consulting, Inc. ("Dereve Consulting"), which was the debtor's new software consulting company at the time; and

(4) On April 28, 2006, Ms. Dereve transferred $7,500 from her father's bank account in England to Dereve Consulting's U.S. bank account.

Ms. Dereve testified that she did not list these transfers in her SOFA because she did not think that they fit within the definition of "transfer" provided in the Bankruptcy Code. Ms. Dereve elaborated that since "transfer" is defined in the Bankruptcy Code as "losing ownership", and since she did not lose ownership in the above transfers, she did not believe they were required to be listed in her SOFA. When asked why she transferred funds sent from her father's bank account in England to Dereve Consulting's bank account as opposed to her personal account, the debtor testified that although all the money transferred was personal, and not business-related, she put the money in the business account in order to save money on wire transfer fees. When impeached with her testimony from the Rule 2004 examination [Exhibit # 22] in which she testified that she transferred the funds to her business account for fear that the funds in her personal account would be garnished, the debtor testified that this was only one of several reasons in transferring the funds to her business account.

## D. *Income*

· Ms. Dereve testified at trial that she has a degree in business and finance. She further testified that she has general background knowledge with regard to accounting principles. In 2002, she was involved with a company called In Balance Solutions, Inc. ("In Balance"). At In Balance, Ms. Dereve provided consulting regarding how to use accounting software. In Balance originally had two members, but by 2004, Ms. Dereve was the only shareholder, ran the company by herself, and prepared the W–2's for the company. Ms. Dereve was also a joint shareholder of Gulf Coast in 2004.

---

**1.** Ms. Dereve testified that this checking account was jointly held in her name as well.

The 2004 federal tax return for In Balance [Exhibit # 5] shows "total income" for the business in the amount of $82,905; a K–1 distribution of ordinary business income ("K–1 distribution") to shareholders of $5,792; and "[c]ompensation of officers" in the amount of $47,500. Ms. Dereve testified that since she was the only officer of In Balance in 2004, all of this compensation was distributed to her. A K–1 distribution [Exhibit # 10] of $3,685 was issued to Ms. Dereve from Gulf Coast in 2004 as well. The amounts provided for In Balance's compensation of officers and the two K-1 distributions equals $56,977.

The debtor's SOFA listed $38,500 as her business income for 2004. Ms. Dereve's 2004 personal federal tax return [Exhibit # 7] listed income from "[w]ages, salaries, tips, etc." as $38,500 and income from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc" as $4,784 for a total income of $43,284. The debtor testified that she did not include the K-1 distribution from In Balance or Dereve Consulting in her 2004 tax return. When asked why she had not reported as income any of the K–1 distributions, Ms. Dereve replied that although she presently understands that she must include K–1 distributions as income, her interpretation of the tax forms as of 2006 was that she only had to include her W–2 wages and not the income she received from the S Corporations.

Ms. Morrissy received a K–1 distribution from Gulf Coast in 2004 and testified that she reported this as income on her own 2004 personal tax return. She testified that she informed the debtor that this constituted income. Ms. Morrissy presented the Court with a letter [Exhibit # 42] she wrote to the debtor on October 12, 2005, shortly after the decision to dissolve Gulf Coast. That letter states

"You[r] schedule K–1 is to be used to report your share of the partnership income on your personal tax return. Please note all income is self-employment income to you. No estimated taxes have been paid on your behalf. All taxes due are your responsibility."

The letter also states that, despite the Special Master not having issued a report regarding Gulf Coast's accounting as of that date, attached to the letter was

an estimate of the Gulf Coast Partners accounting. . . . When the final accounting is available an amended return will be prepared, filed and provided to you. You will then need to amend your 2004 individual tax return.

Ms. Morrissy provided the Court with Gulf Coast's amended 2004 return [Exhibit # 9]. It shows that a K–1 distribution was issued to the debtor in the amount of $6,704.

On December 28, 2005, Ms. Dereve filed Articles of Incorporation for Dereve Consulting. On December 29, 2005, Articles of Dissolution for In Balance [Exhibit # 12] were filed with the Secretary of State in Tallahassee, Florida. The Articles of Dissolution stated that the effective date of dissolution was December 31, 2005.

The 2005 federal tax return for In Balance [Exhibit # 6] shows "total income" for the business in the amount of $70,429; a K–1 distribution of $6,611; and "[c]ompensation of officers" in the amount of $34,000. Since Ms. Dereve was the only officer of In Balance in 2005, all of this compensation was distributed to her. Schedule L of In Balance's 2005 tax return also shows that $32,468 in loans were distributed to shareholders at the end of the tax year. Since Ms. Dereve was In Balance's only shareholder in 2005, all of the loan monies were distributed to her.

The debtor's SOFA listed $34,000 as her business income for 2005. Ms. Dereve's

2005 joint tax return [Exhibit # 8], which she filed with her husband at the time, listed income from "[w]ages, salaries, tips, etc." as $95,498, income from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc." as $5,858, and "CANCELED DEBT INCOME" as $3,249, for a total income of $104,605. When asked what portion of her income was included in her 2005 joint tax return, the debtor testified that, to her recollection, only the $34,000 in officer compensation was included and not her K–1 distribution of $6,611. When asked why she did not include the $32,468 in loans made to her during the 2005 year, the debtor replied that she did not include this amount as income because the proceeds were a loan and not a distribution.

Mari Suzanne Oliver, the debtor's accountant, testified that the $32,468 in loans did not constitute income for Ms. Dereve in 2005 because, despite In Balance's listing as dissolved in 2005, the IRS does not consider a corporation to be dissolved until it has $0 in assets. Since In Balance owned minimal assets beginning in 2006, it was not deemed dissolved under applicable IRS guidelines. In summation, Ms. Oliver testified that the loans did not constitute income in 2005 but may constitute income on Ms. Dereve's 2006 personal tax return.

Despite having Articles of Incorporation for In Balance stating that the effective date of dissolution was December 31, 2005, In Balance bank statements [Exhibit # 8] show that $8,605 was deposited in January 2006 and $7,709.63 was deposited in February 2006. Moreover, the general ledger for Dereve Consulting [Exhibit # 4] shows deposits of $1,281.25 on January 21, 2006; $1,750 on February 1, 2006; $1,875 on February 7, 2006; $375 on February 13, 2006; $2,850 on February 15, 2006; $1,785 on February 22, 2006; $2,361.25 on February 27, 2006; $1,325 on March 8, 2006;

$1,150 on March 10, 2006; $812.50 on March 16, 2006; $1,181.25 on March 18, 2006; $2,947.50 on March 23, 2006; $837.50 on April 5, 2006; $31.25 on April 5, 2006; $27,970 on April 19, 2006; $381.20 on March 19, 2006; $125 on March 19, 2006; $318 on March 27, 2006; $7,500 on March 28, 2006; $61.25 on May 2, 2006; $1,921.25 on May 11, 2006; $93 on May 31, 2006; $300 on June 5, 2006; $541.25 on June 8, 2006; $2,551.25 on June 19, 2006; $790 on June 26, 2006; $1,137.50 on July 8, 2006; $300 on July 13, 2006; and a $100 deposit on a transfer from a Visa card on July 29, 2006. The total amount of deposits into Dereve Consulting's bank account beginning in January 2006 and ending in July 2006 totaled $64,652.20. These figures do not include expenses.

The debtor's SOFA lists $7,000 as "2006 Business Income to date". Furthermore, the debtor's schedules reflect a monthly income of $2,600. The debtor testified that her $2,600 in monthly income did not include income from In Balance because it was dissolved at the time. The debtor further testified that the monthly income did not include any proceeds from Dereve Consulting because she was not receiving income from that company at the time. The debtor clarified this statement by noting that, despite all of the incoming receipts noted in Dereve Consulting's general ledger, she was unable to derive income from that company because expenses of the company absorbed any profit. As of the date of the Court's May 7, 2006 trial, Ms. Oliver testified that she filed an extension for the debtor's 2006 personal tax return but had not yet filed a tax return.

On January 30, 2006, Ms. Dereve deposited the proceeds of a liquidated IRA into her personal bank account in the amount of $15,817.48 [*See* Exhibit # 32]. The debtor testified that she did not include this amount in her SOFA because she did

not believe it was income. She further testified that she intended to roll over the IRA proceeds into a similar account in England but was unable to do so because the IRA funds got absorbed by her rising expenses.

On April 18, 2006, the debtor faxed a letter and financial records from England to Ms. Morrissy's attorney in response to his request to do so [Exhibit # 15]. In the letter, Ms. Dereve stated that she was unemployed as of April 18, 2006. Ms. Morrissy testified that the debtor's general ledger show that she purchased a lot of business-type equipment after April 18, 2006. Ms. Dereve's ledgers do show electronic purchases, but it is not clear whether they were business or personal purchases.

In that same fax, the debtor wrote

Funds from the Bank of America checking account in the amount of $83,000.00 were transferred to a UK account and temporarily held for my benefit in order for me to address my financial affairs while visiting overseas. These funds have now been fully disbursed to settle my financial commitments . . .

At trial, however, the debtor testified that the $83,000 in funds had not been fully disbursed. Instead, the entire amount was transferred back to the United States. The Court's review of the debtor's general ledgers does not reveal that the entire amount was transferred back to the United States.

Ms. Morrissy further testified that the debtor's general ledgers show that she owns a safe that contains or, at one time, contained money. The debtor's general ledgers reveal an entry of "Cash from bank to safe" in the amount of 10,000 pounds on May 1, 2006. According to the Court's review, it appears that the 10,000 pounds was part of the $83,000 in funds Ms. Dereve wire transferred to England

since it was listed on the portion of the ledgers regarding the debtor's transactions in England. Ms. Morrissy testified that 10,000 pounds converts to approximately $18,000 U.S. dollars. The debtor's ledgers show cash withdrawals from the safe that were used to pay expenses. The debtor's ledgers also show that she transferred 4,000 pounds from the safe back into her father's bank account in England. Her father's bank account showed an overdraft of 8.80 pounds as of July 31, 2006. Also, the debtor's ledgers reveal that the balance of money in her safe was $0 as of July 31, 2006. The debtor conceded that she did not list a safe on her schedules and that she owns a safe that is located in the English apartment. However, the debtor did not specify whether the safe she owns is the exact safe to which Ms. Morrissy refers.

### E. *Payments to Creditors*

On the debtor's voluntary chapter 7 petition, the debtor listed the nature of her debts as "Consumer/Non–Business". Part 3(a) ("Payments to creditors") of the SOFA is to be completed by a debtor who has "primarily consumer debts". That section requires a debtor to "[l]ist all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $600." The debtor checked "None" on Part 3(a) of her SOFA.

Part 3(b) of the SOFA is to be completed by a debtor whose debts are "not primarily consumer debts". That section requires a debtor to "[l]ist each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case if the aggregate value of all property that constitutes or is

affected by such transfer is not less than $5,000." The debtor checked "None" on Part 3(b) of her SOFA.

Ms. Dereve testified that she did make payments to creditors prior to filing for bankruptcy. She testified that, prior to filing the present bankruptcy, she had never missed a payment on any financial obligation. Ms. Dereve stated that she did everything in her power, including putting her house up for sale, in order to accumulate enough money to pay off her debts. Ms. Dereve testified that she would have even taken a loss on her house if it meant that she could pay off her debts. She concedes that her general ledgers evidence numerous payments to credit card companies within 90 days prior to filing for bankruptcy. She stated that she tried to pay her credit card debts because, prior to filing for bankruptcy, she had a high credit rating that she desired to maintain. When asked why she failed to list any of these payments on her SOFA, Ms. Dereve testified that she believed she fit under Part 3(b) of the SOFA and therefore, she did not list any of these payments because they did not add up to $5,000 or more, as required under that section.

Since the debtor filed for bankruptcy on July 31, 2006, the 90th day prior to her petition date was May 2, 2006. Per the debtor's ledgers, Ms. Dereve paid

(1) Bank of America an aggregate amount of $9,120.02, comprising

 (a) $5,000 on May 9, 2006, for advances taken on her home equity line of credit,

 (b) $596.25 on June 1, 2006, for advances taken on her home equity line of credit,

 (c) $533.64 on July 3, 2006, for advances taken on her home equity line of credit, and

(d) three mortgage payments of $996.71 each on May 10, 2006, June 12, 2006, and July 10, 2006;

(2) MBNA Visa an aggregate amount of $931.20, comprising

 (a) $109 on May 2, 2006,

 (b) $422.20 on May 25, 2006, and

 (c) $400 on June 5, 2006;

(3) Two months rent (675 pounds per month) for the English apartment on June 30, 2006, and July 31, 2006.

### F. *Ms. Morrissy's Complaint*

On November 2, 2006, Ms. Morrissy filed an adversary complaint against the debtor, in which she claims

(1) The Debtor has destroyed, mutilated, falsified, concealed or failed to keep or preserve books of accounts or records, from which the debtor's true financial condition and business transaction might be determined;

(2) The Debtor has failed to explain satisfactorily any loss of assets or deficiency of assets to meet the Debtor's liabilities;

(3) The Debtor has failed to list the names, addresses, and amounts due and owing all of debtor's creditors; and

(4) During the one year preceding the filing of the Debtor's Voluntary Petition, the Debtor transferred, removed, or concealed assets and funds of the Debtor with intent to hinder, delay or defraud the Plaintiff as a creditor of the Debtor.

The debtor replied to the complaint on November 29, 2006, and denied all of the above allegations.

The Court held a trial on May 7, 2007.

### LAW

■ Based on the allegations listed in the plaintiffs complaint, it appears that Ms. Morrissy is objecting to the discharge

of Ms. Dereve's debts under 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5). In her complaint, Ms. Morrissy also alleges that the debtor "has failed to list the names, addresses, and amounts due and owing all of debtor's creditors." Although listing this allegation in her complaint, Ms. Morrissy failed to provide evidence to the Court supporting such a claim. Moreover, the Court's own review of Ms. Dereve's case does not support such an allegation. Finally, such an allegation does not correspond to any portion of Section 727 that would deny Ms. Dereve a discharge of her debts. Therefore, the Court denies relief to Ms. Morrissy based on her allegation that the debtor "failed to list the names, addresses, and amounts due and owing all of debtor's creditors."

■ One of the fundamental goals of the Bankruptcy Code is to relieve the "honest but unfortunate debtor" of her indebtedness, giving her a financial "fresh start." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). The Supreme Court has stated:

> that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. But in the same breath that we have invoked this fresh start policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.

*Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (internal quotations and citations omitted).

■ Given its importance, actions to deny a discharge are construed strictly against the complaining party and liberally in favor of the debtor. *Rutland v. Petersen (In re Petersen)*, 323 B.R. 512, 516 (Bankr.N.D.Fla.2005). A creditor seeking to deny a debtor's discharge bears the burden of proof as to each element by a preponderance of the evidence. Fed. R. Bankr.P. 4005; *Grogan*, 498 U.S. at 287, 111 S.Ct. 654. However, once a creditor meets this initial burden, the burden shifts to the debtor to show by a preponderance of the evidence that he or she is entitled to a discharge. *Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 755 (Bankr.M.D.Fla. 2000). Thus, the debtor has the ultimate burden of persuasion, demonstrating that he or she is entitled to a discharge despite the evidence presented by the objecting party. *Posillico v. Bratcher (In re Bratcher)*, 289 B.R. 205, 217 (Bankr.M.D.Fla. 2003); *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt)*, 261 B.R. 54, 58 (Bankr.M.D.Fla.2000).

Section 727(a) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

. . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded informa-

tion, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . . .

## A. *11 U.S.C. § 727(a)(2)*

■■■ To deny a debtor's discharge under Section 727(a)(2), the plaintiff must show that the debtor transferred, removed, destroyed, mutilated, or concealed property with the intent to hinder, delay, or defraud her creditors. *Chancellor v. Martin (In re Martin)*, 239 B.R. 610 (Bankr.N.D.Fla.1999); *Sperling v. Hoflund (In re Hoflund)*, 163 B.R. 879 (Bankr.N.D.Fla.1993). The plaintiff bears the burden of demonstrating actual fraudulent intent. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 306 (11th Cir. 1994). However, because a debtor is unlikely to admit her fraudulent intent, a finding of actual intent may be based on circumstantial evidence or inferred from the surrounding facts and circumstances. *See Future Time, Inc. v. Yates*, 26 B.R. 1006, 1007 (M.D.Ga.1983), *aff'd* 712 F.2d 1417 (11th Cir.1983) ("Rarely, if ever, has a debtor taken the witness stand and testified under oath that yes, he transferred the property in question with the intent to hinder, delay or defraud his creditors.").

Ms. Morrissy asserts the debtor's discharge should be denied under Section 727(a)(2)(A) because: (1) the debtor engaged in more than $100,000 in transfers prior to the petition date and concealed $83,000 she claimed to be fully disbursed in her Rule 2004 examination testimony by failing to list such as 2006 income on her SOFA, (2) the debtor concealed $15,817.48 of proceeds from a liquidated IRA by failing to list such as 2006 income on her SOFA, (3) the debtor concealed $32,468 in loans received from In Balance in 2005 by failing to list such as 2006 income in her SOFA, (4) the debtor concealed $6,611 in K–1 distributions received from In Balance in 2005 by failing to list such as 2006 income in her SOFA, (5) the debtor concealed her possession of a safe that housed 10,000 pounds by failing to list ownership of such in her schedules, and (6) the debtor concealed payments in excess of $5,000 to Bank of America and payments in excess of $600 to MBNA Visa and rent on the English apartment, all of which were made within 90 days prior to the petition date and concealed by the debtor's failure to list such on her SOFA.

■■■ Pursuant to Section 727(a)(2), the plaintiff must prove by a preponderance of the evidence that: (1) a concealment of property occurred; (2) the concealment was of debtor's property; (3) the concealment was made within one year prior to the petition date, and (4) the concealment was done with the intent to hinder, delay, or defraud a creditor or the trustee. *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 547 (Bankr.M.D.Fla.2000).

### 1. *Transfers of $100,000 and Concealment of $83,000*

Ms. Dereve testified that she did not list the $100,000 plus in wire transfers in her SOFA because she did not think they fit within the definition of "transfer" provided

in the Bankruptcy Code. Ms. Dereve elaborated that since "transfer" is defined in the Bankruptcy Code as "losing ownership", and since she did not lose ownership in the above transfers, she did not believe they were required to be listed in her SOFA.

11 U.S.C. § 101(54) defines a "transfer" as

(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—

(i) property; or

(ii) an interest in property . . .

The term "transfer" under Section 727(a)(2) and Section 101(54) is to be broadly construed. *Cain v. Shingledecker (In re Shingledecker)*, 242 B.R. 80, 82 (Bankr.S.D.Fla.1999). "The definition of transfer is as broad as possible . . . [A] deposit in a bank account or similar account is a transfer." *In re Levine*, 134 F.3d 1046, 1049 (11th Cir.1998) (*quoting* S.Rep. No. 95–989, 95th Cong., 2d Sess. 26–27 (1978), reprinted in the 1978 U.S.Code Cong. & Admin. News 5787, 5813).

Per the liberal interpretation of the term "transfer", the Court finds that Ms. Morrissy has proven the first three elements of a Section 727(a)(2) violation. Ms. Morrissy testified that the financial records submitted by the debtor evidence $100,000 plus of the debtor's money was involved in wire transfers conducted within one year prior to the petition date. Ms. Dereve's testimony and her financial records confirm that such wire transfers occurred. Moreover, it is undisputed that the debtor's SOFA fails to fist any of these transfers. Therefore, the Court must examine whether the debtor engaged in these activities with the intent to hinder, delay, or defraud her creditors

In order to find fraudulent intent, the Court can consider circumstantial evidence or can infer it from the debtor's actions. *Perry*, 252 B.R. at 547. " 'Badges of fraud' are strong indicators of fraudulent intent." *Id. See Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (M.D.Fla.1991). These badges of fraud include: (1) lack of adequate consideration for the property transferred or concealed ("Badge of Fraud # 1"); (2) a family or close relationship between the parties ("Badge of Fraud # 2"); (3) retention of possession for use and benefit ("Badge of Fraud # 3"); (4) financial condition of the transferor or concealor before and after the transfer or concealment ("Badge of Fraud # 4"); (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit ("Badge of Fraud # 5"); and (6) general chronology and timing of events ("Badge of Fraud # 6"). *Perry*, 252 B.R. at 547; *Ingersoll*, 124 B.R. at 121–22.

Since all of the transactions were wire transfers that involved no consideration, Badge of Fraud # 1 weighs in the creditor's favor. Despite the fact that these transfers involved her father, Badge of Fraud # 2 weighs in the debtor's favor since the proceeds of the wire transfers eventually ended up in the debtor's possession. Since all the proceeds went back to the debtor, Badge of Fraud # 4 also weighs in the debtor's favor since her financial condition was the same after the transfers as it was prior to the transfers. Badge of Fraud # 3 also weighs in the debtor's favor because the debtor has not retained the benefit of the transfers for her own personal benefit and use. The debtor's general ledgers reveal that the entire $83,000 was spent—mostly on ordinary living expenses. Nothing in the Bankruptcy Code prevents a debtor from

continuing to pay expenses prior to filing for bankruptcy. As such, there can be no concealment of money when such money has already been spent to pay ordinary living expenses.

However, Badges of Fraud # 5 and # 6 weigh against the debtor. The debtor testified at her Rule 2004 Examination that one of the reasons she wire transferred money into Dereve Consulting's bank account despite the funds being personal and not business-related was because she feared her personal bank account would be garnished by Ms. Morrissy.[2] This shows that despite Ms. Dereve's explanation that she did not undertake any action to avoid paying her liabilities, she, at the very least, was well aware that transferring funds to her personal bank account after Ms. Morrissy obtained a final judgment against her could result in garnishment of her funds. Therefore, since Ms. Dereve's actions concerning these $83,000 in proceeds occurred after Ms. Morrissy obtained her judgment against the debtor, Badges of Fraud # 5 and # 6 weigh against the debtor.

However, the Court concludes that its findings with regard to Badges of Fraud # 2, # 3, and # 4 outweigh the Court's findings with regard to Badges of Fraud # 1, # 5, and # 6. Ms. Dereve did not conceal the money in the end. She used it to pay bills. Ms. Morrissy may dispute whether Ms. Dereve paid the bills equitably because Ms. Dereve did not pay her. However, the Court concludes the factors weigh in favor of the debtor. Therefore, the Court finds that the circumstantial evidence does not compel a finding of fraudulent intent on the debtor's part. As such, the plaintiff's objection to the debtor's discharge is denied pursuant to Section 727(a)(2)(A) based on the debtor's $100,000 plus in transfers and concealment of $83,000 in money.

### 2. IRA Proceeds

 Ms. Morrissy additionally alleges that the debtor concealed $15,817.48 of proceeds received in January 2006 from a liquidated IRA by failing to list such as 2006 income on her SOFA. "The general rule is that IRA distributions are taxable in the year received." *Welander v. Commissioner of Internal Revenue*, 92 T.C. 866, 868 (1989). "An exception to this rule is effective when the distribution is rolled over into another IRA within 60 days." *Id.* at 869. "This exception only applies if the distribution is actually *paid* into another account." *Id.* "If the distribution is not paid into another account, then the exception never applies and the general rule prevails." *Id.*

 The debtor failed to list the IRA proceeds on her SOFA. The debtor testified that she did not list the IRA proceeds because she planned to roll over the proceeds into a similar account in England. However, the debtor further testified that the IRA proceeds did not get rolled over into a similar account but instead got absorbed by her rising debt. Since the debtor did not roll over the proceeds of her IRA into a similar account within 60 days of receiving it, it did constitute taxable income to the debtor in 2006. *See id.* at 869. The fact that the debtor has not yet filed a 2006 personal tax return due to the fact she exercised her right to file an extension does not change the re-

---

**2.** The Court notes that Ms. Dereve testified that this was only one of her reasons for transferring the money into Dereve Consulting's business account. Another reason included saving money on wire transfer fees. The Court acknowledges and accepts both of the debtor's explanations for transferring the money into Dereve Consulting's bank account but nonetheless deems the debtor's fear of garnishment as weighing Badges of Fraud # 5 and # 6 against her.

sult since, upon filing for bankruptcy, a debtor must report all sources of income and not merely those stated on a filed income tax return. Therefore, the proceeds should have been reported under Part 2 ("Income other than from employment or operation of business") of the debtor's SOFA. Ms. Dereve knew in July 2006 that she had not rolled her IRA proceeds into a new IRA by March or April 2006, and thus, the money would be treated as income. Per the facts stated above, the Court finds that Ms. Morrissy has proven by a preponderance of the evidence that: (1) a concealment of property occurred; (2) the concealment was of debtor's property; and (3) the concealment was made within one year prior to the petition date. *Shappell's Inc.*, 252 B.R. 541 at 547. The Court must now examine whether the Badges of Fraud indicate whether the debtor concealed the IRA proceeds with the intent to hinder, delay or defraud creditors.

Badges of Fraud # 1 and # 2 are inapplicable with regard to the IRA proceeds. Therefore, they weigh in the debtor's favor. The Court also finds that Badge of Fraud # 5 weighs in the debtor's favor because the Court credits Ms. Dereve's testimony that she exercised every avenue she could to pay off her bills. However, the other three Badges of Fraud weigh against the debtor.

Badge of Fraud # 3 weighs against the debtor because the $15,817.48 in proceeds derived from the liquidated IRA in January 2006 appear nowhere in the debtor's schedules. In fact, Part 2 of the debtor's SOFA lists "None" with regard to income derived from other than business operations. The debtor even concedes that she did not list such income on her SOFA because she did not believe it constituted taxable income. However, the Court does not find the debtor's explanation to be

persuasive. The Court notes that the debtor has utilized the services of an accountant, i.e. Ms. Oliver, for a number of years. Ms. Dereve even testified that Ms. Oliver took care of filing her personal and business federal tax returns. Therefore, she had the opportunity and the ability to discover the taxable nature of her IRA proceeds by merely asking Ms. Oliver. Even if she did not have the services of an accountant, the Court would still find this Badge of Fraud to weigh against the debtor because (1) the debtor testified she has background knowledge of accounting principles, (2) the debtor appeared to the Court to be highly sophisticated, (3) the debtor's financial records, which were offered and received into evidence at trial, were highly detailed and evidenced a great deal of knowledge with regard to accounting principles, and finally (4) ignorance of the tax law is generally no excuse. *See Cheshire v. Commissioner of Internal Revenue*, 115 T.C. 183, 196 (2000).

Badge of Fraud # 4 also weighs against the debtor. Prior to the liquidation of her IRA, the debtor had $15,817.48 in IRA proceeds that were beyond her reach. After the liquidation of her IRA, however, the debtor had $15,817.48 in assets that she could utilize as she wished. Again, the Court credits the debtor's testimony that she attempted every avenue she could in order to pay off her debts. This testimony is more credible to the Court considering the fact that most IRAs are exempt from creditors' reaches in bankruptcy. *See* 11 U.S.C. §§ 522(d)(12) & (n). However, upon liquidating her IRA and failing to roll over such proceeds into a similar account, the debtor was under an obligation to report the proceeds as income on Part 2 of her SOFA.

Badge of Fraud # 6 weighs against the debtor because, as mentioned above, proceeds from a liquidated IRA constitute

income if not rolled over into a similar account within 60 days of liquidation. The debtor liquidated her IRA in January 2006 and filed for bankruptcy in July 2006. Since the debtor had not rolled over her IRA proceeds into a similar account by July 2006, which is more than 60 days after liquidation of the IRA, the debtor was under a duty to report such proceeds as income on Part 2 of her SOFA.

■ The Court finds that its findings with regard to Badges of Fraud # 3, # 4, and # 6 outweigh the Court's findings with regard to Badges of Fraud # 1, # 2, and # 5. Even if the money is not available to the creditors at the time of filing, a debtor must fully disclose all transfers. *See Petersen,* 323 B.R. at 517 ("Debtors must make full and complete disclosures on their bankruptcy schedules...."). Therefore, the Court finds that the circumstantial evidence compels a finding of fraudulent intent on the debtor's part. As such, the debtor's discharge is denied pursuant to Section 727(a)(2)(A) based on the concealment of $15,817.48 in liquidated IRA proceeds.

### 3. *Business Loans*

■ Ms. Morrissy further contends that the debtor concealed $32,468 in loans received from In Balance in 2005 by failing to list such as 2006 income on Part 1 ("Income from employment or operation of business") of her SOFA. With regard to these loans, the debtor testified that she did not list this amount on her SOFA because it was not a distribution but merely a loan. Ms. Morrissy testified that upon the dissolution of In Balance in 2005, such loans constituted income that should have been reported on the debtor's SOFA. However, the debtor's accountant, Ms. Oliver, testified that the IRS does not deem a corporation dissolved until it has $0 in assets. Since In Balance had minimal as-

sets entering the 2006 year, it was not considered dissolved in 2005, and therefore, the loans to the debtor did not constitute taxable income. Assuming, without deciding, that Ms. Oliver's assessment of the taxable nature of the loans is correct, the Court will not analyze the elements to establish a Section 727(a)(2) violation because it appears Ms. Dereve was relying on her accountant's advice. Therefore, Ms. Morrissy's objection to the discharge of the debtor's debts under Section 727(a)(2)(A) is denied with regard to the $32,468 in business loans.

### 4. *K–1 Distribution*

■ Ms. Morrissy further contends that the debtor concealed a K–1 distribution in the amount of $6,611 received from In Balance in 2005 by failing to list such as 2006 income in Part 1 of her SOFA. Ms. Dereve testified at trial that she did not believe K–1 distributions constituted income at the time she filled out her 2004 and 2005 personal tax returns. However, she conceded at trial that she presently understood that she should have listed her K–1 distributions as income in those years. The debtor did not clarify whether she acquired this information before or after filing for bankruptcy. The Court will assume, however, that such information was acquired after filing for bankruptcy. As such, the debtor had an affirmative duty to amend her SOFA to reflect the $6,611 received as a K–1 distribution. *See Snowden v. Fred's Stores of Tenn., Inc.,* 419 F.Supp.2d 1367, 1372 (M.D.Ala.2006) ("[D]ebtors are under a continuing duty to amend their bankruptcy schedules"). Despite not having filed a personal tax return for 2006, the K–1 distribution of $6,611 the debtor received from In Balance constituted income that should have been included under Part 1 of her SOFA.

Therefore, per the facts stated above, the Court finds that Ms. Morrissy has proven by a preponderance of the evidence that: (1) a concealment of property occurred; (2) the concealment was of debtor's property; and (3) the concealment was made within one year prior to the petition date. *Shappell's Inc.*, 252 B.R. 541 at 547. The Court must now examine whether the Badges of Fraud indicate whether the debtor concealed the 2005 K–1 distribution from In Balance with the intent to hinder, delay or defraud creditors.

The Court finds Badges of Fraud # 1 and # 5 irrelevant with regard to the K-1 distribution. Therefore, they weigh in the debtor's favor. However, the remaining Badges of Fraud weigh against the debtor.

Badge of Fraud # 2 weighs against the debtor because, as the sole shareholder and sole employee of In Balance, the debtor and In Balance had a close relationship. Badge of Fraud # 3 weighs against the debtor because neither her schedules nor her testimony at trial reveal exactly what happened with the $6,611 received. Therefore, the Court can only assume that the debtor retained the money and used it for her own personal benefit. Badge of Fraud # 4 weighs against the debtor because the debtor's financial situation was $6,611 better than it was before such distribution. Badge of Fraud # 6 weighs against the debtor because, chronologically, a K-1 distribution received in 2005 must be reported as 2006 income. Since the debtor failed to list such as income, this Badge of Fraud weighs against her.

The Court concludes that its findings with regard to Badges of Fraud # 2, # 3, # 4 and # 6 outweigh the Court's findings with regard to Badges of Fraud # 1 and # 5. Therefore, the Court concludes that the circumstantial evidence compels a finding of fraudulent intent on the debtor's part. As such, the debtor's discharge is denied pursuant to Section 727(a)(2)(A) based on the concealment of a K-l distribution in the amount of $6,611 received from In Balance in 2005.

### 5. *10,000 Pounds in a Safe*

■ Ms. Morrissy further alleges that the debtor's general ledgers evidence that the debtor had 10,000 pounds stored in a safe. Ms. Morrissy testified that 10,000 pounds converts to approximately $18,000 U.S. dollars. Ms. Morrissy testified that the debtor's general ledgers show that, within weeks of filing for bankruptcy, the debtor removed and utilized some of the funds from the safe. The Court's review of the debtor's general ledgers confirms Ms. Morrissy's testimony. Ms. Morrissy therefore alleges that since the debtor failed to list such safe on her schedules, she concealed the safe as well as the money stored within it. The debtor testified that she does have a safe in the English apartment that she failed to list in her schedules. She did not clarify, however, whether the safe she owns is the same safe to which Ms. Morrissy refers.

The debtor did not indicate whether or not the money in the safe was part of the $83,000 she wire transferred to England. The Court's review of the debtor's general ledgers regarding her transactions in England reveal an entry of "Cash from bank to safe" in the amount of 10,000 pounds on May 1, 2006. Since the debtor wire transferred $83,000 to England prior to May 1, 2006, and since the debtor's general ledgers do not evidence that this entire amount was wire transferred back to the United States, it appears that the 10,000 pounds stored in the safe was part of the $83,000 the debtor wire transferred to her father's bank account in England. However, the debtor's general ledgers reveal that the entire $83,000 was spent on ordinary living expenses. In fact, the debtor's general ledgers reveal a balance of $0 of money in

her safe and an overdraft of 8.80 pounds in her father's bank account in England as of July 31, 2006. The burden is on Ms. Morrissy to prove that the debtor concealed the money in the safe. Since the debtor's general ledgers reveal that the entire 10,-000 pounds was spent, the plaintiff has failed to sustain her burden with regard to the 10,000 pounds.

However, the debtor has sustained her burden with regard to the debtor's failure to list the safe as property in her schedules. Therefore, per the facts stated above, the Court finds that Ms. Morrissy has proven by a preponderance of the evidence that: (1) a concealment of property occurred; (2) the concealment was of debtor's property; and (3) the concealment was made within one year prior to the petition date. *Shappell's Inc.*, 252 B.R. at 547. The Court must now examine whether the Badges of Fraud indicate whether the debtor concealed her possession of the safe with the intent to hinder, delay or defraud creditors.

Badges of Fraud # 1 and # 2 are inapplicable to the safe. Therefore, they weigh in the debtor's favor. However, the remaining Badges of Fraud weigh against the debtor.

Badge of Fraud # 3 weighs against the debtor because the debtor owned the safe and failed to list such ownership on her schedules. Therefore, she retained the safe for her own personal benefit and use. Badge of Fraud # 4 weighs against the debtor because her financial situation was bettered by concealing her ownership of the safe. Badges of Fraud # 5 and # 6 weigh against the debtor because, upon filing for bankruptcy, the debtor had a duty to list her possession of the safe in her schedules. Her failure to do so deprived her creditors of knowledge of such an asset. Disclosure of the existence of a safe would allow creditors and the trustee

to ask appropriate questions as to the contents of the safe. *See Petersen*, 323 B.R. at 517 (Bankr.N.D.Fla.2005) ("Failure to list even a worthless or valueless item may give rise to a denial of discharge under [Section 727(a)(2)], if such failure was with the requisite intent.... Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to the debtor to decide upon the relevance or value of assets or information before including it on his or her schedules.... This requirement enables the trustee and creditors to rely on the information supplied by the debtors.").

The Court holds that its findings with regard to Badges of Fraud # 3, # 4, # 5, and # 6 outweigh the Court's findings with regard to Badges of Fraud # 1 and # 2. Therefore, the Court finds that the circumstantial evidence compels a finding of fraudulent intent on the debtor's part. As such, the debtor's discharge is denied pursuant to Section 727(a)(2)(A) based on her concealment of ownership of a safe by failing to list it as property in her schedules.

### 6. Payments to Creditors

Ms. Morrissy further alleges that the debtor made payments to creditors within 90 days prior to the petition date and concealed these transfers by failing to list them in her SOFA. With regard to Part 3(a) of the SOFA, which requires a debtor with "primarily consumer debts" to "[l]ist all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $600[,]" the debtor checked "None" because, per her testimony, she believed that she fit under Part 3(b) of the SOFA.

Part (3)(b) of the SOFA requires a debtor whose debts are "not primarily consumer debts" to "[l]ist each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $5,000." The debtor checked "None" on Part 3(b) of her SOFA because, per her testimony, she did not pay creditors more than $5,000 within 90 days prior to the petition date.

With regard to the "aggregate value" language listed in Part 3(a) and Part 3(b), the Court has found cases that "aggregate" all payments made to creditors, regardless of the separate amounts paid to each individual creditor. *See Cadle Co. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328, 347–48 (Bankr.M.D.Fla.2002). The Court has also found cases that only "aggregate" payments made to each separate creditor to determine whether such payments exceed the $600 or $5,000 benchmarks mentioned in the SOFA. *See Kaler v. Schrader (In re Schrader)*, 2006 WL 4392771, at *8 (Bankr.D.N.D. Aug.11, 2006). The debtor's payments to creditors hit both benchmarks, despite the method employed by the Court. Therefore, without ruling on the proper method to employ in all cases, the Court will employ the latter method for purposes of this opinion.

The Court first notes that the debtor's voluntary chapter 7 petition listed Ms. Dereve's debts as consumer debts. Therefore, considering Ms. Dereve had an experienced bankruptcy attorney at all times, the Court finds the debtor's testimony as to why she did not believe she belonged under Part 3(a) of her SOFA unavailing. Within 90 days prior to her petition date, the debtor paid an aggregate amount of $931.20 to MBNA Visa, an aggregate amount of 1,350 pounds for rent on the

English apartment, and an aggregate amount of $9,120.02 to Bank of America. These payments should have been listed under Part 3(a) of her SOFA.

Assuming Ms. Dereve did fit under Part 3(b), the Court also finds her testimony stating she failed to list such payments in Part 3(b) of her SOFA because they did not aggregate to more than $5,000 similarly unavailing since the Court's own calculations derived from the debtor's general ledgers, which Ms. Dereve voluntarily submitted into evidence, prove that the debtor paid Bank of America an aggregate amount of $9,120.02 within 90 days prior to her petition date.

Therefore, per the facts stated above, the Court finds that Ms. Morrissy has proven by a preponderance of the evidence that: (1) a concealment of property occurred; (2) the concealment was of debtor's property; and (3) the concealment was made within one year prior to the petition date. *Shappell's Inc.*, 252 B.R. 541 at 547. The Court must now examine whether the Badges of Fraud indicate whether the debtor concealed these payments to creditors with the intent to hinder, delay or defraud creditors.

Again, the Court credits the debtor's testimony that she attempted to pay off her debts prior to filing for bankruptcy. Her large payments to debtors, most of which would have been unsecured creditors in the present bankruptcy case, confirms the debtor's sincere efforts to pay her bills. Therefore, since Ms. Dereve would have potentially been able to discharge these debts in bankruptcy had she not paid them prior to filing for bankruptcy, the Court finds Badges of Fraud # 1, # 2, # 3, and # 4 weigh in her favor. The remaining two Badges of Fraud, however, weigh against the debtor.

 Badge of Fraud #5 weighs against the debtor because the cumulative effect of her payments to creditors and her subsequent failure to list such transfers on her SOFA deprived the creditors and trustee of the knowledge that Ms. Dereve used more than $10,000 in proceeds to pay select creditors. Badge of Fraud #6 weighs against the debtor since such payments to creditors were made within 90 days prior to filing for bankruptcy. As such, she was required to list such transfers on her SOFA. Although the debtor's sincerity to pay off her debts was evidenced by the Court at trial, full and accurate disclosure is required when an individual files for bankruptcy. *See Petersen,* 323 B.R. at 517 ("Debtors must make full and complete disclosures on their bankruptcy schedules....").

The Court finds that its findings with regard to Badges of Fraud #5 and #6 outweigh the Court's findings with regard to Badges of Fraud #1, #2, #3, and #4. Therefore, the Court concludes that the circumstantial evidence compels a finding of fraudulent intent on the debtor's part. As such, the debtor's discharge is denied pursuant to Section 727(a)(2)(A) based on the transfer of $10,000 plus in payments to creditors and her subsequent concealment of these transfers by failing to list such on her SOFA.

### B. *11 U.S.C. § 727(a)(3)*

 A creditor objecting to discharge under Section 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's transactions." *Grant v. Sadler (In re Sadler),* 282 B.R. 254, 263 (Bankr.M.D.Fla.2002) *(quoting Meridian Bank v. Alten (In re Alten),* 958 F.2d 1226, 1232 (3d Cir.1992)). If the creditor shows the debtor's records

are inadequate, then the burden shifts to the debtor to justify such inadequacies. *Id.*

 Ms. Morrissy's complaint derives from the fact that the debtor failed to provide copies of the debtor's personal 2006 federal tax return. The debtor's accountant, Ms. Oliver, testified that she filed an extension for the debtor's tax return and has not yet prepared it. Upon filing for bankruptcy, the Code only requires a debtor to provide tax returns for the tax year ending immediately before the date of filing. 11 U.S.C. § 521(e)(2)(A)(i). In this case, Ms. Dereve filed for bankruptcy in 2006, thereby requiring her to provide copies of her 2005 federal tax return. Ms. Dereve complied with this requirement, and although she may be compelled to provide a copy of her 2006 federal tax return when she completes it, nothing in the Code prevents the debtor from exercising her right to file an extension for such tax return.

Although listing the failure of the debtor to provide adequate records in her complaint, Ms. Morrissy, in fact, derived her entire testimony from the numerous pages of financial records provided by the debtor and never once testified as to the inadequacy of the debtor's records, beyond the debtor's failure to provide her with her 2006 federal tax return. Forty-two exhibits comprising hundreds of pages of material, most of which include financial records provided by the debtor, were offered and received into evidence. The Court's own review of the records leads it to conclude that the debtor went above and beyond her responsibility to maintain adequate records and provide it to interested parties in this proceeding. Therefore, the plaintiff's objection to a discharge of Ms. Dereve's debts is denied under Section 727(a)(3).

## C. *11 U.S.C. § 727(a)(4)*

 A debtor will be denied a discharge pursuant to Section 727(a)(4)(A) if he or she knowingly and fraudulently made a false oath or account. *Sperling v. Hoflund (In re Hoflund)*, 163 B.R. 879, 882 (Bankr.N.D.Fla.1993). The plaintiff must establish the following elements by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Syngenta Seeds, Inc. v. Eigsti (In re Eigsti)*, 323 B.R. 778, 783–84 (Bankr.M.D.Fla.2005); *Shappell's Inc.*, 252 B.R. at 549. *See also Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir.1991); *In re Chalik*, 748 F.2d 616 (11th Cir.1984). Deliberate omissions from schedules or the statement of financial affairs may also constitute false oaths or accounts. *Swicegood*, 924 F.2d at 232; *Chalik*, 748 F.2d at 618.

 For a false oath to be considered material, it must be demonstrated that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618 (citations omitted). Additionally, the false oath or account must be made with the requisite intent, specifically a knowing intent to defraud creditors. *Swicegood*, 924 F.2d at 232. However, actual intent may be inferred from circumstantial evidence. *Chancellor v. Martin (In re Martin)*, 239 B.R. 610, 614 (Bankr.N.D.Fla.1999) (citing *Hoflund*, 163 B.R. at 882–83).

 To support her Section 727(a)(4) claim, Ms. Morrissy relies on omissions from Ms. Dereve's schedules and SOFA. The omissions alleged by Ms. Morrissy include Ms. Dereve's failure to list the items already discussed in the Court's discussion under Section 727(a)(2), namely (1) the debtor's failure to list the $100,000 plus in transfers she engaged in prior to filing and $83,000 as 2006 income in her SOFA, (2) the debtor's failure to list $15,817.48 of proceeds from a liquidated IRA as 2006 income in her SOFA, (3) the debtor's failure to list $32,468 in loans received from In Balance in 2005 as 2006 income in her SOFA, (4) the debtor's failure to list a K–1 distribution for $6,611 received from In Balance in 2005 as 2006 income in her SOFA, (5) the debtor's failure to schedule her possession of a safe that housed 10,000 pounds, and (6) the debtor's failure to list more than $5,000 in payments made to creditors within 90 days prior to the petition date in her SOFA.

Ms. Morrissy also alleged that Ms. Dereve did not provide a complete list of all household goods, furnishings, and clothing in the debtor's possession. Ms. Morrissy testified that the debtor's general ledgers show that she spent $20,091.44 on office equipment, household goods, and electrical goods within six months prior to filing for bankruptcy and $2,452.42 on clothing and shoes within six months prior to filing for bankruptcy. The debtor did not refute such testimony, and the Court's own review of the debtor's general ledgers confirms Ms. Morrissy's testimony. Ms. Morrissy further supports her allegation by noting that the debtor's schedules do not list the whereabouts of numerous pieces of furniture that were included in photos taken within six months prior to the petition date and submitted to the Court as evidence. Again, the Court's review of the pictures and testimony at trial supports Ms. Morrissy's allegations. In essence, Ms. Morrissy alleges that the debtor's Schedule B, which lists her household goods/furnishings at $1,205 and clothing at $70, is false.

▆ The veracity of a debtor's bankruptcy petition, including the schedules and statement of financial affairs, is essential to the successful administration of the debtor's case. *Crews v. Stevens (In re Stevens),* 250 B.R. 750, 754 (Bankr. M.D.Fla.2000). "Therefore, submissions must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir.1992)). A debtor coming before the bankruptcy court must come clean and make full disclosure of all information relevant to the administration of his or her case. *Heidkamp v. Grew (In re Grew),* 310 B.R. 445, 450–51 (Bankr. M.D.Fla.2004). It is not for the debtor to decide what is and is not relevant. *Id.* at 451. A debtor who omits important information and fails to make full disclosure, places his or her right to discharge in serious jeopardy. *Id.* While an isolated omission may be attributed to oversight, a pattern of omissions clearly warrants the conclusion that the omissions from the SOFA and the schedules were made with the requisite fraudulent intent. *Id. See Grew,* 310 B.R. at 451 (incomplete, improper, or incorrect information in the debtor's schedules or statement of financial affairs may sometimes be forgiven if the debtor is not represented by an attorney or is unsophisticated). When there is a pattern of omissions, it is logical to conclude the debtor did in fact make a false oath in connection with the case. *See Hoflund,* 163 B.R. at 883.

After a thorough review of all the evidence of this case, the court finds that the debtor's discharge should be denied under Section 727(a)(4)(A). When a debtor signs her bankruptcy schedules and SOFA, she signs them under penalty of perjury that the information contained within the documents is true and correct. Ms. Dereve was represented by an experienced bankruptcy attorney at the time she completed and filed her schedules and SOFA. Therefore her pattern of omissions and incorrect information will not be excused. While certain omissions may have been due to oversight or inadvertence, the pattern of omissions and false statements warrants the conclusion that the statements and omissions were made with the requisite fraudulent intent. *Hoflund,* 163 B.R. at 883. Thus, Ms. Dereve's discharge will be denied based on Section 727(a)(4)(A).

### D. 11 U.S.C. § 727(a)(5)

▆ "In order for [the plaintiff] to succeed in obtaining a denial of discharge pursuant to [Section] 727(a)(5), [she] must prove that [the debtor] owned a substantial identifiable asset and that the asset is no longer available to the debtor's creditors. Once a showing of lost assets has been made, the burden shifts to the debtor to explain the loss to the court's satisfaction. A satisfactory explanation requires the debtor to demonstrate good faith in the conduct of [her] affairs and in explaining loss of assets." *ITT Commercial Fin. Corp. v. Walz,* 115 B.R. 353, 357 (Bankr. N.D.Fla.1990) (internal citations omitted).

▆ Ms. Morrissy testified that the debtor's general ledgers showed that she owned a safe into which she placed 10,000 pounds, which converts to approximately $18,000. The Court's review of the debtor's general ledgers reveal that this 10,000 pounds was part of the $83,000 the debtor wire transferred to her father's bank account in England. Ms. Morrissy further testified that the debtor failed to explain the whereabouts of the $83,000 in funds she wire transferred to her father's bank account in England. In a fax sent to Ms. Morrissy's attorney, Ms. Dereve wrote that the $83,000 was transferred overseas in order to handle her financial affairs

while there. She further stated in the fax that the entire $83,000 had been fully disbursed. However, at trial, Ms. Dereve testified that the money was not disbursed but had, in fact, been transferred back to the United States. Therefore, the Court finds that Ms. Morrissy has sustained her initial burden in proving that the debtor owned a substantial asset and that the asset is no longer available to the debtor's creditors. The burden now shifts to the debtor to explain the loss of this asset.

As mentioned earlier in the Court's opinion, the entire $83,000 was spent on ordinary living expenses and payment of debts prior to the petition date. The debtor testified that, prior to the events that led her to file for bankruptcy, she had never missed a payment to any creditor. She testified that she tried her best to pay off her debts prior to filing for bankruptcy. The Court observed the debtor at trial and finds her testimony both sincere and credible as to her good faith efforts to pay off her debts prior to filing for bankruptcy. Therefore, the Court finds that the debtor has posited a satisfactory explanation in explaining the loss of $83,000 in assets. As such, the Court finds that the plaintiff's objection to the debtor's discharge should be denied under Section 727(a)(5).

THEREFORE IT IS ORDERED AND ADJUDGED that the plaintiffs objection to discharge is denied under 11 U.S.C. §§ 727(a)(3) and (a)(5) but granted under 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A).